```
                 UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - x

RUTH DIXON, ET AL               :  No. 3:11CV-982 (SRU)
                                :  915 Lafayette Boulevard
             vs.                :  Bridgeport, Connecticut
                                :
                                :  March 12, 2012
SCOTT ZABKA, ET AL              :

- - - - - - - - - - - - - - - x

                    MOTION HEARING

B E F O R E:

     THE HONORABLE STEFAN R. UNDERHILL, U. S. D. J.

A P P E A R A N C E S:

   FOR THE PLAINTIFF:

          NEW HAVEN LEGAL ASSISTANCE
               426 State Street
               New Haven, Connecticut  06510
          BY:  JAMES BHANDARY-ALEXANDER, ESQ.
               SHELLEY A. WHITE, ESQ.

          STATE OF CONNECTICUT
               EMPLOYMENT SECURITY APPEALS DIVISION
               249 Thomaston Avenue
               Waterbury, Connecticut  06702
          BY:  SUSAN NOFI-BENDICI, ESQ.

   FOR THE DEFENDANT:

          ROBINSON & COLE
               One Commercial Plaza
               280 Trumbull Street
               Hartford, Connecticut 06103-3597
          BY:  STEPHEN W. ARONSON, ESQ.

          JONES DAY
               222 East 41st Street
               New York, New York  10017
          BY:  MATTHEW W. LAMPE, ESQ.
```

Susan E. Catucci, RMR
Official Court Reporter
915 Lafayette Boulevard
Bridgeport, Connecticut   06604
Tel: (917)703-0761

```
 1
 2                    (4:00 O'CLOCK, P. M.)
 3          THE COURT:  Good afternoon.  We're here in Dixon
 4   v. Zabka.  Could I have appearances, please?
 5          MR. BHANDARY-ALEXANDER:  James
 6   Bhandary-Alexander for the plaintiffs.
 7          MS. WHITE:  And Shelley White for the
 8   plaintiffs.
 9          MS. NOFI-BENDICI:  Susan Nofi-Bendici for the
10   plaintiffs.
11          THE COURT:  Thank you.
12          MR. ARONSON:  And Stephen Aronson,
13   A-R-O-N-S-O-N, for the defendant Scott Zabka and S. Z.
14   Enterprises, Inc.
15          THE COURT:  Thank you.
16          MR. LAMPE:  Matt Lampe, Your Honor, for
17   defendant Scott Fetzer Companies doing business as the
18   Kirby Company.
19          THE COURT:  Okay, great.  Thank you.
20          Well, we've got two sets of motions, if you
21   will.  The motions for partial judgment on the pleadings
22   and then the motion to proceed as a collective action.
23          I've reviewed all of those and I think, given
24   the number of issues raised, I think what I'd like to do
25   is give you my initial impressions of the case and allow
```

```
1    each of you -- or the motions, and allow each of you to

2    focus your arguments on the points that you think might be

3    incorrect.  Any objection to doing that?

4              MR. LAMPE:  Your Honor, if I might just ask the

5    court if you received a letter from plaintiff's counsel

6    this morning, some of the claims are no longer at issue on

7    the motion to dismiss.

8              THE COURT:  I did not receive that letter.

9              MR. BHANDARY-ALEXANDER:  Okay.  I sent a letter

10   to the court.  We're agreeing to withdraw certain of the

11   independent dealers claims, and those claims are their

12   overtime claims, and we're limiting their minimum wage

13   claims to the week of training.

14             So, what I think we've agreed to do tomorrow,

15   the day after, is to send a formal stipulation that

16   plaintiffs will withdraw those claims.

17             MR. LAMPE:  Yes, Your Honor.  The agreement is

18   that those claims are going to be dismissed with

19   prejudice.

20             MR. BHANDARY-ALEXANDER:  That is right, yep.

21             MR. LAMPE:  So it's -- as to the independent

22   dealers, it's Counts Two and Four in their entirety.

23             THE COURT:  Right.

24             MR. LAMPE:  And then counts as to the

25   independent dealers, Counts One and Three with the
```

```
1    exception of the first week of work which we did not move

2    on in our moving papers.  That's the week in which the

3    independent dealers claim that they were in training, for

4    that whole week, so we did not move to dismiss the first

5    week of work for the independent dealers.

6           But all other weeks we moved on.  And then again

7    the overtime claims for all weeks, including the training

8    week, and plaintiff's letter this morning indicated they

9    did agree to dismiss with prejudice those claims.

10          MR. BHANDARY-ALEXANDER:  Right.  And the one

11   thing to be aware of is that Counts One through Four are

12   the minimum wage and overtime claims, and they include the

13   claims for both the appointment setters and the

14   independent dealers.  So, when we say that we're

15   dismissing the overtime claims in Counts One and Three or

16   Counts Two and Four, we actually mean just for the

17   independent dealers, not for the appointment setters.

18          THE COURT:  Okay.  Just so that I'm clear, the

19   dealers are going to still have a claim with respect to

20   the first week of work?

21          MR. BHANDARY-ALEXANDER:  Right.

22          MR. LAMPE:  Just the minimum wage claim, not the

23   overtime claim.

24          THE COURT:  Minimum wage, okay.

25          MR. LAMPE:  So, Counts One and Three for the
```

1    first week of work.

2         THE COURT:  And they are going to have the

3    negligent misrepresentation and unjust enrichment claims?

4         MR. LAMPE:  Right, and then there's also Count

5    Five and Count Six, which all of the plaintiffs have.  We

6    move to dismiss Count Five, not Count Six.

7         THE COURT:  Right, correct.  Okay.  And Count

8    Five has got the -- it's the question of failure to pay

9    all monies.

10        MR. LAMPE:  Yes, Your Honor, that's Count Five.

11        MR. BHANDARY-ALEXANDER:  Right.  And I should

12    say we have not pled the tort claims for the appointment

13    setters, et al, so it's just the dealers on the tort

14    claims.  It's everybody on the all monies, all wages due

15    claim, and then the modifications we were just talking

16    about the other claims.

17        THE COURT:  Okay.  All right, well, that's

18    helpful.  Thank you.

19        MR. BHANDARY-ALEXANDER:  So, Judge, if I may, as

20    a practical matter, I think that means we don't need to

21    argue about the outside sales exemption today.

22        THE COURT:  That's what it sounds like.

23        MR. LAMPE:  Yes, we agree with that.

24        MR. ARONSON:  We agree, Your Honor.

25        THE COURT:  Okay, good.  All right.  Well, let

```
1    me just tell you my initial impressions.  I'll start at
2    the bottom line and we can maybe go into more detail as
3    needed.
4            I think we still need to deal with the
5    Connecticut wage payment laws, all monies and wages due.
6    My sense is that that claim should be dismissed with
7    respect to the independent dealers but denied with respect
8    to the appointment setters.  The what I'll call common law
9    claims, misrepresentation claims and unjust enrichment
10   claims I think survive a 12(c) motion.
11           The existence of a contract here is not -- well,
12   first off, the contract doesn't disclaim reliance.  It's
13   basically a traditional merger clause.  And the existence
14   of a contract doesn't necessarily preclude the bringing of
15   a claim for unjust enrichment that is not inconsistent
16   with the contract.  So, it seems to me that those claims
17   probably survive, at least at this point.
18           The failure to pay all monies due, I think the
19   claim is that the setters were not compensated for hours
20   spent in training or at mandatory meetings.  And that, I
21   think, can be broadly interpreted, sufficiently broadly
22   interpreted as raising a claim under 31-72 of Connecticut
23   General Statutes, even though that law is not specifically
24   cited in the amended complaint.  So I think the setters
25   get by.
```

```
 1              The dealers aren't -- as I understand it,
 2      there's no allegation that they had an existing contract
 3      for the payment of wages such that 31-72 comes into play.
 4      Rather, their claim in effect is that their independent
 5      contractor agreement is undercut by the fact that they had
 6      the sufficient control by the alleged employer that they
 7      are really employees and not independent contractors, but
 8      they don't have a, they don't have, as I understand it, an
 9      agreement that they claim is violated in the sense they
10      should have paid X dollars on Y date.
11              And so, anyway, that's how I'm thinking about
12      going and I think the remaining claims have been addressed
13      by your letter.  Have I missed any?
14              MR. BHANDARY-ALEXANDER:  No.
15              MR. LAMPE:  I think that's it.
16              THE COURT:  Okay.  So why don't each of you take
17      a shot at whatever aspect of that initial view you think
18      is incorrect.
19              MR. BHANDARY-ALEXANDER:  I'll start, if that's
20      all right.
21              THE COURT:  Doesn't matter to me.
22              MR. BHANDARY-ALEXANDER:  Okay.  Thank you, Your
23      Honor.  Since we started in on the 12(c) motion, I'll
24      start there.  I'll make -- I'll try to keep everything
25      brief.
```

1          Of course we agree with you naturally enough

2     that the tort claim should survive and we agree with you

3     that the all wages due claim should survive for

4     appointment setters.

5          We do disagree about whether the all wages due

6     claim should survive for the independent dealers, and the

7     reason is is that there were agreements made, which I'll

8     point to in the complaint, between the defendants and the

9     dealers as to how much they would be paid.  And I'll point

10    out in the complaint where we think these --

11         THE COURT:  That's independent of the

12    independent dealer agreement itself.

13         MR. BHANDARY-ALEXANDER:  Right, that is

14    independent of the independent dealer agreement.  And I

15    will note that the independent dealer agreement, the

16    independent dealer agreements that we have here today are

17    here by virtue of them being referenced in our complaint.

18         THE COURT:  Right.

19         MR. BHANDARY-ALEXANDER:  We're missing one

20    entirely and we don't, we haven't got -- frankly we

21    haven't gotten discovery either for Ishea Anderson

22    Rodriguez, and the dealer agreement for Kenny Ford is not

23    signed, so to the extent that the court is worried about

24    the effect of the independent dealer agreement on the

25    dealers, it should only be -- you should be only worried

1     about it for Plaintiff Dixon and Plaintiff Smith.

2           So, in terms of what's in the complaint that we

3     think you could reasonable infer as an agreement, in the

4     first, first instance, there's a promise of 500-dollars a

5     a week which we allege was made to all dealers and which

6     we allege the dealers, by inference the dealers agreed to

7     because they showed up to work.

8           Then on page 13 of the complaint, paragraph 23,

9     we allege that there were promises of wages, bonuses and

10    prizes to both groups of employees.  It was during

11    employment the dealers continued to work and so we think

12    you could reasonably infer an agreement as to those

13    bonuses and prizes.  And bonuses and prizes is a

14    characterization but -- that is how they were

15    characterized but they are just wages.

16          On --

17          THE COURT:  Well, you don't allege that there

18    was a specific agreement.  You say that, you say that

19    agreements existed.  You don't say they were supposed to

20    be paid a bonus every third Thursday.

21          MR. BHANDARY-ALEXANDER:  No, they were supposed

22    to be paid 500-dollars a week minimum in the first

23    instance.  Then they were also supposed to be paid for

24    various discrete accomplishments that were in the form of

25    bonuses and prizes.  And normally the courts have

1    interpreted bonuses, commissions, prizes, to be part of

2    the wages as described in the Connecticut statute.

3            So, to the extent that those promises were made

4    and the workers kept on working, we think it's reasonable

5    to assume that there was a meeting of the minds there,

6    that there was an agreement.  Because -- I'm sorry.

7            THE COURT:  I'm sorry.  I have to see if I can

8    find the amended complaint for a second.  I didn't bring

9    it out.  But what I hear you saying is that the allegation

10   is a broad allegation that promises were made.

11           MR. BHANDARY-ALEXANDER:  Promises were made.

12           THE COURT:  But is that, is that type of

13   allegation sufficient -- in other words, don't you have to

14   say not that promises were made but what the promises

15   were?

16           MR. BHANDARY-ALEXANDER:  Well, we do, in fact,

17   say that in paragraph 41 after describing the work that

18   the dealers do, 41 alleges "Such work was done by the

19   independent dealers with the understanding that they would

20   be provided with a minimum of 15 each week and they would

21   receive the promised minimum payment of 500-dollars a

22   week."

23           I think the word "understanding" is a little bit

24   closer to what you're looking for, but at a baseline I

25   would say every employment relationship is essentially

1    contractual and that if your employer lays out a certain

2    wage structure and the employee goes to work and keeps

3    working, there is -- I think it's reasonable to infer that

4    there is an agreement on that wage structure.

5           THE COURT:  Well, okay.  And your point about

6    the, that you made at the very beginning about the

7    independent dealer agreements is to give me comfort that

8    the merger clause in that agreement doesn't apply.  Is

9    that why you raised it?

10          MR. BHANDARY-ALEXANDER:  Well, I think that's

11   right.  I mean to the extent that -- I was sort of

12   anticipating defendant's argument, which is that the

13   independent dealer agreement for most of these claims

14   provides a get-out-of-jail-free card, and my only point

15   was, well, if it does that, it only does that for two of

16   the plaintiffs, not for all four of them because there are

17   signed agreements with two of the plaintiffs.

18          As a general proposition, the independent dealer

19   agreements do not describe at all what happened in the

20   Orange office at S. Z. Enterprises.  And so I think as a

21   general, as a general matter, our position is that it

22   doesn't affect any of the claims.  But to the extent that

23   the defendants think it does, it certainly would only

24   apply to the people who actually signed it.

25          And I think the -- if I can throw out the word

```
1    "policy," I think the policy argument in support of that
2    position is essentially -- in support of our whole
3    argument on the wages due issue is that wage and hour law
4    is sort of notoriously hostile to agreements that pretend
5    to contract away wage payment claims.
6              It's true of the Fair Labor Standards Act.  It's
7    true of the Connecticut analogue which we're talking about
8    here, and that this agreement on the ground would mean
9    that employers could promise anything and the workers
10   could keep working because of those promises and because
11   of their agreements to those terms, and then we come here
12   and they say, look, we have a get-out-of-jail-free card
13   because you signed something that says, well, actually
14   you're going to be paid the difference between what you
15   bought the vacuum cleaner for and what you sold it for.
16   And that just does not describe the reality of the
17   situation at all.  The agreement has nothing to do with
18   what the plaintiffs actually did at work.
19              (Pause)
20         MR. BHANDARY-ALEXANDER:  And, Your Honor, if I
21   may, my co-counsel reminds me that we do have now after --
22   because we've been into discovery, we've sort of just
23   gotten in but we're a little bit into discovery, we do
24   have, we do have documents that describe the actual pay
25   structure, but I shouldn't say the actual -- the supposed
```

1    pay structure, that's the Enterprise's.  I don't know

2    whether they are signed or not.  I just don't recollect.

3    I don't have them here, but there is a document out there

4    that describes how dealers were supposed to be paid.

5           THE COURT:  Well, okay.  Let me hear from the

6    defense on the question of the -- I guess it's Count Five

7    with respect to the dealers.

8           MR. LAMPE:  Thank you, Your Honor.  With respect

9    to the dealers, the complaint, the amended complaint,

10   that's what we're talking about on our motion to dismiss,

11   does not allege a contract by the independent dealers to

12   get paid for the amounts that they are claiming they were

13   not paid for.  What we're talking about with respect --

14          THE COURT:  It's a promise but it's not a

15   contract, is your view.

16          MR. LAMPE:  Correct, Your Honor.  If the

17   plaintiff is going to proceed under 31-72, which is not

18   pled in the complaint, that's a provision that plaintiffs

19   in their opposition to our motion at page 12, footnote 11,

20   admits "does not provide the substantive right to any

21   particular amount of money.  It's simply a vehicle through

22   which somebody who is owed money through some other right

23   can proceed to collect that money."

24          THE COURT:  Right.

25          MR. LAMPE:  So in order to proceed under 31-72

for the dealers, they would have to have established that

there's a contract which was valid and enforceable and was

breached by the defendants, and they don't allege that in

this complaint.

The contract that they acknowledge exists, which

is the independent dealer agreement, does not, they just

got done saying to you does not provide for the

compensation that they feel they are entitled to get.

And if there were a contract, I would also point

out, to cover the other compensation that they feel they

are entitled to, I think it's inconsistent for them to on

the one hand argue that there's a contract that provides

for their right to certain compensation, but then on the

unjust enrichment claim, that we argue should be dismissed

because there's a lack of contract -- because there is a

contract, for them to say, well, no, that unjust

enrichment claim should proceed because there is no

contract.  So I think they have to sort of pick one way or

the other.  Either there's a contract, in which case the

unjust enrichment claim should be dismissed, Count Nine,

or there's not a contract, in which case Count Five should

be dismissed.

I think the fairest reading of the amended

complaint is they have not alleged the contract and so

Count Five should be dismissed because there's no

1    underlying contract that would support a right to recover

2    under 31-72.

3              And with respect to the plaintiff's setters,

4    unless I've completely missed it, there's nothing in the

5    amended complaint that speaks to any sort of contractual

6    agreement between the appointment setters and the

7    defendants to be paid for the training time or to be paid

8    for the meetings or things of that nature.

9              And I, my understanding of Count Five in this

10   complaint all along from the beginning was that what they

11   were claiming as the underlying basis for the money that

12   they were seeking under the 31-71, which is what is pled

13   in the complaint, was the wage and hour statutes.  That's

14   the way we briefed this.  We thought that that analysis

15   did that.

16             THE COURT:  For the setters.

17             MR. LAMPE:  For the setters and for the

18   independent dealers, because neither one, the setters or

19   the dealers, allege a breach of contract in this case.

20   Neither the appointment setters nor the dealers even point

21   to any sort of contract that they claim was valid and

22   enforceable and would entitle them to the relief they were

23   seeking through Count Five.

24             Our conclusion was then the Count Five was being

25   used to try to get at what the statute said they were

entitled to, minimum wage and overtime and the like.  And
our point there was, as the cases we cited indicate, that
Count Five, you know, this is a, what we refer to anyway
as a tying of payment or wage payment statute.  It deals
with how regularly wages need to be paid.

31-72, that's what's cited in our complaint.  It
says you need to be paid weekly and the date that you get
paid, your regular payday can't be more than eight days
beyond the last day of the week for which you're getting
paid.  And it talks about if you're terminated, depending
on whether it's voluntary or involuntary, you need to be
paid by a certain date.

Our point in our papers here is that they are
not alleging that there was not a regular payday or that
it came too late.  They are not alleging they didn't get a
final paycheck.  As a matter of fact, on Count Five they
specifically talk about regular paychecks.  They
specifically talk about the final payments that they got
upon termination.

What they were getting at, it seemed to us
anyway, this was a vehicle to try to get what they're
claiming they are owed under the federal and state minimum
wage and overtime statutes, and our point was that Count
Five is not an appropriate vehicle to try to recover
through the statutes.  The statutes, of course, provide

1    their own mechanism of recovery.

2         THE COURT:  Well, okay, but with respect to the

3    setters, you acknowledge they are employees.  Why isn't

4    there -- I think the Supreme Court has said that there's

5    an implied contract, at least with respect to every

6    employment relationship.

7         So, you know, they show up, you're paying them X

8    dollars per hour, they work X hours, they have get Z total

9    compensation.  And their argument here is in their weekly

10   paycheck they may have gotten it on time but they didn't

11   get the full amount they are owed under their implied

12   contract of employment.

13        MR. LAMPE:  Well, my point to that would be they

14   are not claiming they are not getting paychecks.  They are

15   getting paid for certain things but not other things.  I

16   don't think they could allege they had any sort of basis

17   to think that they contractually were going to get these

18   things that from day one they didn't get.  That's why we

19   have this case, is because they were not getting paid for

20   the training meeting.  They did not get paid for time when

21   the phones went down and they did not get paid for the

22   other things.

23        THE COURT:  Right.

24        MR. LAMPE:  So, they don't allege, certainly

25   there's no course of conduct that was suggested that the

1    company had agreed to pay them for that.  There's no

2    requirement under contract law to pay your employees for

3    anything in particular if it's a matter of whatever the

4    contract says.  Wage and hour statutes of course do

5    require certain minimum wage paid or overtime paid, but

6    that's not what we're talking about here.

7         So I don't think for the setters there is any

8    sort of contract alleged in the complaint that there --

9    they thought they had a contract that entitled them to

10   these little pockets of pay as opposed to just they didn't

11   get their paychecks at all or something along those lines.

12        THE COURT:  Can't you read the complaint as

13   alleging that they make X dollars on, what is it, 8.50 an

14   hour?  And they didn't receive in their weekly paycheck

15   the full payment for the hours that they worked.  In other

16   words, what they are saying is I get 8.50 an hour,

17   whatever it is, and I worked, you know, whatever, X number

18   of hours and they only paid me X minus five, six, seven,

19   this past week.

20        I understand that you want to say that that's a

21   wage claim but it's not nearly a wage claim, I don't

22   think, because the wage claim says you have to get minimum

23   wage.  This is a different claim.  The claim here is I

24   have an agreement to make X dollars an hour, which they

25   paid me for some of the hours I worked but not all of the

1    hours I worked.

2         MR. LAMPE:  Well, the amended complaint is

3    vaguely drafted about whether there's any agreement with

4    the setters.  I didn't see any language in the amended

5    complaint where the appointment setter is alleging a

6    contractual right to payment for the things that are in

7    dispute.

8         To say that they are getting $8.50 an hour, if

9    that's all that they are saying that was told to them,

10   that wouldn't be specific enough to create a contract.

11   They were getting 8.50 an hour for certain work, but

12   there's these disputed pockets that they are claiming they

13   were never paid for from day one.

14        So under what circumstance could they claim a

15   contractual right?  They weren't told they were going to

16   get paid for the meetings.  There's no course of conduct

17   that would suggest they going to be paid for the meetings.

18        THE COURT:  Well, the course of conduct doesn't

19   really work because that's the claim.  You know, you can't

20   use the fact that you didn't pay what they claim you ought

21   to pay as a defense to the claim that you didn't pay what

22   you ought to pay.

23        MR. LAMPE:  Well, under a breach of contract you

24   could.  Certainly under the wage statutes you can't, you

25   cannot contract around what the statutes require you to

```
 1    pay your employees.  That's regulated by the federal and
 2    state law.
 3            THE COURT:  But what you're getting into is the
 4    merits.  You're saying the merits are our contract
 5    excluded hours working at X, Y and Z tasks.
 6            MR. LAMPE:  Well --
 7            THE COURT:  And what they are saying is I had an
 8    agreement that I was going to work at 8.50 an hour.
 9            MR. LAMPE:  I didn't see anywhere in the amended
10    complaint where they are alleging that agreement, any
11    particular pay for any particular type of work, and I
12    apologize to the court if I've overlooked it.  Again, I
13    was viewing this as an attempt to piggyback on the wage
14    payment statutes, the federal wage payment statutes.  I
15    wasn't reading it for breach of contract.
16            I think it's telling there's no claim of breach
17    of contract in there, which would seem odd to me if that
18    was the basis for their claim under 31-72 which, again,
19    there's confusion because they didn't cite 31-72 in the
20    complaint.
21            THE COURT:  Well --
22            MR. BHANDARY-ALEXANDER:  Your Honor, if I may,
23    just because this has come up multiple times.  I should
24    say that we did cite to 31-72 in the complaint on the last
25    page.
```

```
 1              THE COURT:  Yes, okay.

 2              MR. BHANDARY-ALEXANDER:  Under Number Five.

 3              THE COURT:  Yeah, whatever.  What I'm looking at

 4       is the section beginning on page 22 at paragraph 45.

 5       Appointment Setters -- it's got a heading, is entitled

 6       Appointment Setters Also Were Not Paid For All Of Their

 7       Work.  Now, I think when you read that section, you come

 8       away with, you know, all the clock-out type of allegations

 9       and so forth.  It's not just a wage claim, I don't think.

10       It strikes me, you know, again, literally construed, it

11       strikes me as we had an agreement that we would be paid

12       hourly for our work and we weren't.

13              MR. LAMPE:  Well, I think I've made my point as

14       well as I can make it.  I don't think these paragraphs

15       here on page 22 and 23 give rise to any plausible

16       allegation that there was a contractual right to the

17       disputed amounts.  It's speaking in terms of the policy is

18       not to pay for these things.

19              And if you go to work with the company and the

20       policy is not to pay you for certain things, and you're

21       not paid for those things and you're paid for the things

22       that the policy is that you would be paid for, you may

23       have a claim under a statute if they haven't paid you

24       according to state law or federal law, but I wouldn't

25       think you'd have a contract claim for that.
```

1          And I just don't see anything that's specific to

2     claiming we had an agreement, the agreement provided for

3     payment for X, Y and Z and we were not paid for X, Y and

4     Z.

5          But -- and as to the dealers, you know, there

6     was no contract other than an independent dealer

7     agreement, and that did not provide for the monies that

8     they are claiming that they were not entitled to.

9          And again, I would repeat my point about the

10    unjust enrichment claim.  It just seems to me one of these

11    claims five or nine should go.  If there's a contract that

12    governs the compensation that's being sought, then they

13    can't have an unjust enrichment claim.

14         THE COURT:  Well, I mean they can plead in the

15    alternative.  I understand the argument.  They are not

16    going to win both of those.

17         Going back to the earlier point, look at

18    paragraph 76.  "The weekly paychecks that were issued to

19    the appointment setter plaintiffs did not include all

20    monies due for each week worked."

21         MR. LAMPE:  My understanding of all monies due

22    -- I read this and maybe I missed the boat, Your Honor,

23    but I read all monies due as meaning all monies due --

24         THE COURT:  Under the statute.

25         MR. LAMPE:  -- under the federal and state

```
 1    hourly wage statute.  I did not read -- and it's the first

 2    time, coming here today, the first I've heard the

 3    interpretation of this agreement that all monies due were

 4    due under some sort of contractual obligation.

 5            THE COURT:  Well, I would agree that it's a

 6    broad reading of the complaint but I think, my sense is

 7    that -- and I'll hear from plaintiff's counsel, but my

 8    sense is that is what was intended by the complaint.

 9            MR. BHANDARY-ALEXANDER:  Yes sir, it was.  And

10    the same logic applies to independent dealers.

11            THE COURT:  Well --

12            MR. BHANDARY-ALEXANDER:  Unlike --

13            THE COURT:  Well, go ahead.  I have a little

14    trouble with that but go ahead.

15            MR. BHANDARY-ALEXANDER:  Unlike the appointment

16    setters, there isn't an hourly rate.

17            THE COURT:  Right.

18            MR. BHANDARY-ALEXANDER:  What there is is an

19    agreement between the defendants and the plaintiffs that

20    they would receive X amount of dollars for Y work.  Five

21    hundred dollars for 15 product demonstrations a week.

22    Again, paragraph 41 of the complaint, after describing the

23    work independent dealers do, it says "Such work was done

24    by independent dealers with the understanding they would

25    be provided a minimum of 15 appointments each week and
```

1    they would receive a promised minimum payment of

2    500-dollars per week."

3              Every employment relationship is contractual.

4    Our whole, the whole point of our case is it is an

5    employment relationship and this is -- an understanding is

6    exactly what the "all wages due" in 31-72 demand.  What

7    did the parties agree would be the rate of pay?  What did

8    they agree?  And this complaint, again obviously with

9    reasonable inferences drawn in our favor, not in their

10   favor, screams out that there was an understanding, an

11   agreement that was breached.

12             And 41 is probably the most, paragraph 41 is

13   probably the most explicit statement of it, using the word

14   "understanding," which is a kind of a contract word, but I

15   don't -- well, let me put it this way.  If I'm wrong, I

16   hope you'll give us leave to amend because it won't be

17   duplicative.

18             MR. LAMPE:  Your Honor, also on the dealers, we

19   do have a contract the parties actually signed for the

20   dealers and it does have an integration clause and that

21   would seem to me to preclude the dealers from claiming any

22   of the other contract other than the one they signed in

23   the independent dealer agreement.

24             THE COURT:  Although the plaintiff is claiming

25   that not all of the plaintiffs actually signed those.  Do

1    you have --

2         MR. LAMPE:  Two of four signed.  We have one for

3    the third, and if I'm not stating things correctly, the

4    names on the top of the signature is missing and the last

5    agreement we don't have.  However, the allegations in the

6    complaint and the admissions that plaintiffs have made in

7    either the motion to dismiss papers or the conditional

8    certification papers is that there was a standard form

9    agreement.  They are claiming there was a standard form

10   agreement.

11        So I think it's fair to assume all four of the

12   named plaintiffs had a standard form agreement, and it

13   does have the integration clause.  With respect to the

14   dealers, the integration clause is not sufficient to

15   preclude a reasonable reliance under a fraud theory.  It

16   certainly should preclude the predicate, the contractual

17   predicate that the plaintiffs claim that they could

18   proceed under 31-72 for something inconsistent with what

19   the independent dealer agreement says.

20        MR. BHANDARY-ALEXANDER:  Your Honor, the

21   independent -- as I said, the independent dealer

22   agreements, there are two missing.  They are the ones who

23   produced them.  They are the ones who thought it was

24   relevant to this discussion.  We don't have anymore so I

25   think it would be hard to assume that the other two exist.

```
1              And as with the standard integration clause,
2      I'll just repeat that the wage and hour laws, both in
3      Connecticut and at the federal level, but here we're
4      talking about Connecticut, are very hostile to these type
5      of get-out-of-jail-free agreements that say in this case
6      to marginal unemployed workers down on their luck, well,
7      you may have had -- you may have thought you had an
8      agreement, but this piece of paper says you don't.  It
9      doesn't work for the fraud theories.  It doesn't work for
10     the negligent misrepresentation.  It doesn't work to
11     preclude unjust enrichment because it's, as a policy
12     matter, a very bad outcome.
13              MR. LAMPE:  Well, when counsel referred just now
14     to this get-out-of-jail-free card and the wage and hour
15     laws precluding these things, I think we're mixing
16     concepts here.  It is certainly true under the Connecticut
17     overtime and minimum wage statutes and the federal minimum
18     wage and overtime statutes, private parties, employees and
19     employers cannot contract around the obligation to pay
20     minimum wage and overtime.  That I understand and agree
21     with.  There's no law cited anywhere in these papers that
22     indicates that Connecticut does not adhere to integration
23     clause or that somehow they are unenforceable as a matter
24     of policy.
25              THE COURT:  No, no.  All right, let me back up
```

```
1      for a second.  How do the dealers fall under 31-72 when

2      they don't have the type of -- even assuming you win the

3      argument that they've been misclassified and they should

4      be employees, there's not the same situation with respect

5      to them.  They are not getting a weekly paycheck that

6      includes a hourly rate and they can't claim you didn't pay

7      us all the hours that we worked.

8              I mean I understand that is 31-72 under -- for

9      the setters.  But what we've got with the dealers is an

10     independent dealer agreement, and I understand you're

11     trying to get around that, but there was never an

12     understanding with the so-called employer that the dealers

13     would be paid, you know, X -- you know, for X hours a week

14     or Y dollars per hour or that type of thing.  You've got

15     much more of a commission-based compensation system here,

16     so how do you -- even assuming you got the allegation

17     about the 500-dollars, how does that help you?

18              MR. BHANDARY-ALEXANDER:  Well, we do assume that

19     we have the allegation of --

20              THE COURT:  I don't mean assume.  You do have

21     the allegation of 500-dollars.  Assuming that is a

22     contract, how does that help you?  That's a stand-alone --

23     I don't understand it to be a situation where there's a

24     claim, a more standard claim under 31-72.  I worked X

25     hours, I was supposed to get Y dollars and I got less than
```

1    that.

2             MR. BHANDARY-ALEXANDER:  I have, I think I have

3    your answer here.

4             THE COURT:  Okay.

5             MR. BHANDARY-ALEXANDER:  I could be wrong.

6    31-71a, the definition of wages means "Compensation for

7    labor or services rendered by an employee, whether an

8    amount as determined on a time task commission or other

9    basis of calculation."  That's 31-71a of the Connecticut

10   General Statutes.

11            So there was -- here we're alleging a wage

12   agreement that's based in part on the 500-dollar an hour

13   guarantee.  It's based in part on a commission structure,

14   a bonus structure, a prize structure, all of which are

15   referenced in the complaint.  And certainly wages under

16   31-71a are exactly covered by 31-72.

17            By definition, 31-72 says "When any employer

18   fails to pay them fully wages in accordance with the

19   provisions of Sections 31-71a to 71-71i," et cetera, et

20   cetera.

21            MR. LAMPE:  I would point out, Your Honor

22   paragraph 75 in Count Five with respect to the dealers,

23   the allegation of the monies, all monies due not being

24   paid as tied explicitly to the treatment of the plaintiffs

25   as independent contractors.  It's not tied to any sort of

1    an agreement that the parties have entered into.  The

2    allegation, the only fair reading of paragraph 75 is that

3    because these individuals were classified as independent

4    contractors and not treated as employees, they were not

5    receiving the statutory rights that employees have,

6    minimum wage and overtime, and that that's what the

7    alleged all -- failure to pay all monies due is tied to.

8            MR. BHANDARY-ALEXANDER:  Your Honor, 75 may not

9    be perfectly drafted, but it doesn't circumvent what 31-72

10   and 31-71a actually say, which is that all wages due, and

11   wage is defined as defined in 31-71a, have to be paid.

12           MR. LAMPE:  And these allegations about

13   promises, this is all part of a fraud claim, where the

14   allegation in the complaint is that the defendant was

15   never intending to provide those things.  Again, that's

16   just completely inconsistent with there being a meeting of

17   the minds, or I should say with the plaintiff pleading a

18   meeting of the minds.

19           The allegations in the amended complaint is that

20   the defendant did not intend to provide certain things and

21   did not provide certain things, and that the failure to

22   pay all monies due for the dealers is as a result of their

23   being misclassified as independent contractors, not

24   getting minimum wage or overtime.  There's insufficient

25   basis here on the face of the amended complaint to allege

1    any sort of a contractual right to these monies that are

2    being sought under Count Five.

3          THE COURT:  All right.  And how do you get

4    around the integration clause problem again?

5          MR. BHANDARY-ALEXANDER:  The integration -- with

6    regard to the minimum wage law or --

7          THE COURT:  Yes.  In other words, the argument

8    is there are these independent dealer agreements; they

9    don't provide for this so called minimum 500-dollars a

10   week.  They have integration clauses.  And now you're

11   arguing that there's a promise outside the written

12   agreement that has an integration clause that has been

13   violated and that you come within 31-72 as a result.

14         MR. BHANDARY-ALEXANDER:  There's two answers to

15   that, one of which is that this independent dealer

16   agreement which they've produced, because we referenced it

17   in the case, is only one piece of paper in a mountain of

18   other evidence about what was agreed to or not agreed to,

19   and we're sitting here on a 12(c) motion instead -- I mean

20   the real question is does, as a matter of law does this

21   independent agreement, independent dealer agreement

22   preclude all wages due, all wages due claim, and we

23   haven't gotten to all of the other evidence yet.

24         THE COURT:  Well, it doesn't preclude it but

25   doesn't it define the wages that are due?  In other words,

```
 1     how can someone reasonably say there was a 500-dollar
 2     minimum due if the written contract that they have
 3     governing their compensation doesn't include that but does
 4     include an integration clause?
 5               MR. BHANDARY-ALEXANDER:  It doesn't govern their
 6     compensation.  This contract has nothing to do with how
 7     they were actually compensated.  It's -- it really
 8     literally bears no resemblance to facts alleged in the
 9     complaint or what the discovery showed.
10               What is in the independent dealer agreement is,
11     in paragraph two, is that "Dealers shall pay the full
12     purchase price of all current systems together with any
13     charges," et cetera, et cetera.  And essentially they'll
14     get the difference between what they buy the Kirby vacuum
15     cleaner for and what they sell it for.
16               THE COURT:  Right.
17               MR. BHANDARY-ALEXANDER:  It never happened.
18     None of that ever happened.
19               THE COURT:  So you have a breach of contract.
20     You have a breach of contract claim.
21               MR. BHANDARY-ALEXANDER:  I don't think it's a
22     breach of -- well, I think the way it is laid out here,
23     the compensation that's described here is a whole other
24     way of compensating people.
25               THE COURT:  Right.  That's my point.
```

1          MR. BHANDARY-ALEXANDER:  And it's a way of

2    compensating people that, first of all, bears no

3    resemblance to what actually happened and, second of all,

4    does, I think, further --

5          THE COURT:  Well --

6          MR. BHANDARY-ALEXANDER:  -- a policy of --

7          THE COURT:  Let me try it this way.

8          MR. BHANDARY-ALEXANDER:  Yes.

9          THE COURT:  As I understand the allegations, the

10   independent dealers weren't paid wages.  They were, they

11   were getting compensated based upon their sales.  No?

12         MR. BHANDARY-ALEXANDER:  That's 31-71a, Your

13   Honor.  The definition of wages includes commissions,

14   includes prizes, bonuses, it includes all that.

15         THE COURT:  Right.  So they have an agreement,

16   which they have a written agreement that talks about them

17   getting paid the difference between the sales price and

18   the purchase price, right?

19         MR. BHANDARY-ALEXANDER:  Right.

20         THE COURT:  That's what they are earning.  Did

21   they --

22         MR. BHANDARY-ALEXANDER:  They are not --

23         THE COURT:  You're not alleging, are you, that

24   they received a regular paycheck in the ordinary sense of

25   that word?

1          MR. BHANDARY-ALEXANDER:  They could receive

2     payments based on a commission.

3          THE COURT:  Right.

4          MR. BHANDARY-ALEXANDER:  They could receive

5     payments based on -- there are certain other sorts of

6     schemes like if you did six product demonstrations you

7     could get 60-dollars.  I think that's in the complaint.

8     If you did 15 product demonstrations, you were supposed to

9     get 500-dollars.  Those were the actual agreements that

10    these dealers were making with the defendants.

11         THE COURT:  So you're saying that those

12    agreements are ancillary to the written agreement?

13         MR. BHANDARY-ALEXANDER:  I'm saying those

14    agreements -- if I struggle with the definition of

15    ancillary, you'll forgive me, but those are separate

16    agreements from what's in this written agreement.

17         THE COURT:  They supplement the written

18    agreement in your view.

19         MR. BHANDARY-ALEXANDER:  They surround, envelope

20    and overwhelm this little written agreement.  This little

21    written agreement is made in the context of a series of

22    fraudulent promises and a series of other types of wage

23    agreements, the commissions, the bonuses, the prizes, and

24    is -- which kind of gets to the policy point that, to find

25    that this was the real agreement between the dealers and

1    the defendants is to say that all the defendants have to

2    do is make them sign a piece of paper in the middle of all

3    this other whirlwind of promises and agreements.  Because

4    this one says, this one says we can't modify this except

5    through written agreement which is, of course, a piece of

6    legalese and it just doesn't make sense.

7            And I should also say there's another reason.

8    Another thing is that these agreements were signed after

9    they started working, so it wouldn't -- even under the

10   quibble, it would destroy the claim, which is limit the

11   claim to the days prior to the signing of the agreement.

12           MR. LAMPE:  The agreement signed by the dealer

13   says they agree that this agreement, independent dealer

14   agreement, supersedes all prior agreements.  So again, the

15   plaintiff is proceeding under this sort of contract

16   predicate to the 31-72 agreement.

17           If there were such an agreement -- I don't

18   believe they plead it -- it would be superceded, and the

19   reason they haven't pled it is when they talk about

20   allegations and the like -- I'll repeat myself from

21   earlier -- they are specifically saying these are

22   statements made without the intent to actually do these

23   things.  This does not read the way a contract claim ought

24   to read in a complaint if someone is asserting a contract

25   claim.

1           But beyond all that, they were superceded to the

2     extent they existed by the independent dealer agreement.

3           THE COURT:  So, if after the written agreement

4     is signed, they are promised we're going to pay you at

5     least 500-dollars a week provided you do X, Y and Z, why

6     does that not raise a claim under the --

7           MR. LAMPE:  If after the independent dealer

8     agreement were signed?  I don't think there are

9     allegations that it was after.  The allegations are that

10    it was before.  But even so, the independent dealer

11    agreement governs how an amendment would be made if there

12    were an amendment.  It would have to be in writing and

13    signed by the parties.  That's part of the integration

14    clause language.

15          THE COURT:  Right, but why is this something

16    that comes within the terms of that agreement?

17          MR. LAMPE:  Because it would be an agreement

18    that would relate to compensation.  I mean what the

19    independent dealer agreement says is that this is the sole

20    agreement between the parties as to the subject matter.

21    There's a very large paragraph in the independent dealer

22    agreement, paragraph two, that deals with compensation,

23    but certainly there were, certainly you can read this

24    agreement fairly, the only way, by assuming that it covers

25    compensation -- and that's predominantly what this covers,

```
1     some other things as well -- so there's an additional
2     agreement relating to compensation that's inconsistent
3     with this written agreement.
4             If it's prior, it's superceded.  If it's
5     subsequent, which I don't believe is pled with any
6     specificity, then it would be not within the terms that
7     the parties agreed to as to how a modification of the
8     agreement would be made.
9             MR. BHANDARY-ALEXANDER:  But, Your Honor, we
10    don't have to --
11            MR. LAMPE:  And there's no allegation in the
12    complaint that this agreement was modified in any way at
13    the time.
14            THE COURT:  Well, okay, but the problem is the
15    suggestion that is being made today is that not every one
16    of the plaintiffs has such an agreement.  That is, they
17    haven't been signed and so there may be, there may be a
18    large group that doesn't have, doesn't have these things
19    signed.  It's a defense to the merits more than it is a
20    bar to the claim if only some but not all of the dealer
21    plaintiffs have these agreements.
22            So, okay, I think I'm leaning toward allowing
23    that claim to survive the motion.  What else do you have
24    for me that you disagree with?  I think the other aspects
25    have to do with the misrepresentation and unjust
```

1    enrichment claims.

2              MR. LAMPE:  Right.  I'll stand on what I put in

3    the papers on those.

4              THE COURT:  Yes.

5              MR. LAMPE:  I don't think there's anything that

6    I can say that would be new, that you haven't already

7    heard from us on that.

8              THE COURT:  All right.  We've done a lot of back

9    and forth.  I don't know if anybody wants me to explain in

10   greater detail or maybe in a fairly more coherent fashion

11   why I'm going to deny the motion, the 12(c) motion with

12   respect to the claim for failure to pay monies and wages

13   due under the state statute, and deny the motion with

14   respect to misrepresentation and unjust enrichment claims.

15   Anybody want further statement of that?

16             MR. LAMPE:  Not necessary from our perspective.

17             MR. BHANDARY-ALEXANDER:  No.

18             THE COURT:  Okay.  So I'm going to deny those

19   motions.  Obviously the letter we described earlier has an

20   impact on what was otherwise within the motion, and I

21   think the 12(c) motion, therefore, is completely ruled on.

22             Let's take up the motion to proceed as a

23   collective action.  It seems to me, given the minimal

24   burden at this point in the two-step process that reserves

25   two of the defendants the opportunity to decertify at a

1    later stage, that the motion ought to be granted in

2    substantial part.

3            The part that is not apparent to me that ought

4    to be granted is the minimum wage claims alleged by the

5    setters.  It's not apparent to me, notwithstanding the

6    ability to get by a 12(c) motion, that there's any

7    evidence at all that there's been a minimum wage violation

8    with respect to the appointment setters because the time

9    for which they claim they weren't paid is brief enough

10   each week that when one recalculates the claim by total

11   hours worked, total amount paid, the resulting math shows

12   that the hourly rate exceeded the minimum wage.

13           At least that's how I see it.  So if I'm missing

14   something, let me know, but under those circumstances it's

15   not apparent that there's any evidence that there was in

16   fact a minimum wage violation on behalf of the setters.

17           MR. BHANDARY-ALEXANDER:  May I?

18           THE COURT:  Yes.

19           MR. BHANDARY-ALEXANDER:  Your Honor, if you

20   would look at the affidavit of Mahagany Bivens, which is

21   possibly V, it's the last exhibit, and if you look at

22   number six, you'll see that that's exactly what she's

23   sworn to.

24           THE COURT:  I'm sorry, which exhibit?

25           MR. BHANDARY-ALEXANDER:  Yes, I'm sorry, it's

1    Exhibit V.

2              MR. LAMPE:  V?

3              MR. BHANDARY-ALEXANDER:  V as in Victor.  It's

4    the very last -- it's the exhibit that was attached to the

5    reply.

6              THE COURT:  Oh, to the reply.

7              MR. BHANDARY-ALEXANDER:  I'm sorry.

8              THE COURT:  And this is the Bivens --

9              MR. BHANDARY-ALEXANDER:  This is Mahagany

10   Bivens.

11             THE COURT:  Okay.

12             MR. BHANDARY-ALEXANDER:  I was not paid the

13   minimum wage with that week, all the hours I worked, I

14   received 184-dollars and 21.75 hours, minimum wage would

15   have been 195.85.  So there is direct evidence of a

16   minimum wage violation and I should say on conditional

17   certification, it's extremely common for courts to look at

18   both affidavits, declarations, deposition testimony, and

19   also the allegations in the complaint.

20             And here we have a sworn statement of a -- with

21   a minimum wage violation and we had allegations in the

22   complaint that all of the plaintiffs did in fact suffer

23   minimum wage violations under CUIPA.

24             THE COURT:  You survived 12(c).  I don't see a

25   problem in the way you pled it, but the question is

```
1    whether it can proceed as a collective when there isn't
2    evidence -- I don't have evidence, okay, you give me one
3    person but what reason is there to believe that anybody
4    else --
5            MR. BHANDARY-ALEXANDER:  Well, you have reason
6    by the good faith representations made in the complaint.
7    You have reason to believe based on what Mahagany Bivens
8    swore to.  You have reason to believe because of the other
9    allegations in these affidavits.  They're not allegations
10   in the affidavits but they are sworn statements about
11   being clocked out, about --
12           THE COURT:  Great, but I told you why that
13   doesn't help you, so what I have is evidence that one
14   plaintiff one week didn't get paid the minimum wage, but
15   now we're talking about whether this proceeds as a
16   collective action.  Don't I need some evidence that this
17   was a recuring problem that affected more than one
18   plaintiff on one week?
19           MR. BHANDARY-ALEXANDER:  I think the answer is
20   no.  This burden is described as minimal.  This is
21   probably the smallest burden that we'll face in this
22   entire case is on this motion for conditional
23   certification.
24           There are conditional certifications that are
25   granted with no affidavits.  There are conditional
```

1    certifications that are granted by -- without any

2    allegation of an actual CUIPA violation in the affidavits.

3    There are conditional certifications that are granted

4    based on the affidavits that everybody did the same thing

5    at work and so they are similarly situated.

6           So, because that is actually the question, is

7    whether they are similarly situated, whether there was a

8    common scheme or plan, to say, well, we don't know how

9    many violations there were is really a merits

10   determination and conditional certification is never

11   decided on the merits.

12          We've given the court some evidence, and I

13   should say that if the court wanted affidavits from the

14   other plaintiffs, it wouldn't be too hard to do but I

15   don't think it's necessary because this is actually a

16   merits argument.

17          MR. LAMPE:  Your Honor, it's a minimal burden

18   but it is nonetheless a burden and it is an evidentiary

19   burden.  Myers v. Hertz, the 2nd Circuit confirmed there

20   has to be evidence supporting the allegation that there is

21   a common unlawful practice that would affect the people

22   that are in the reputed class.  And what we have with

23   respect to the setters is there's four named plaintiffs,

24   appointment setters, and in the plaintiff's original

25   motion there was no evidence at all that any of those four

1    suffered minimum wage violations.  In our papers we walk

2    the court through the math.  In the plaintiff's reply they

3    came up with one person who could claim for one week a

4    minimum wage violation.  It is a low burden.  It's a low

5    bar, Your Honor, but it's not nonexistent and Myers v.

6    Hertz indicates it needs to be respected, and the

7    plaintiffs have simply not justified conditional

8    certification for the purposes of notice to the punitive

9    class based on one person one week.

10        The same thing holds true of the setters'

11   overtime claim.  The plaintiffs admit in their papers that

12   only one of their plaintiffs, setter plaintiffs, even ever

13   worked overtime and has an overtime claim.  So, again,

14   there's been no showing with respect to the setter

15   overtime claim that there was any sort of a recuring

16   problem that people have been deprived of overtime.

17        But let me also point out that we're not talking

18   about the dealers here at this moment, but in the

19   conditional certification with respect to the dealers is a

20   much smaller issue now as well.  In light of the

21   plaintiff's agreement to dismiss with prejudice the dealer

22   overtime claims, there should not be conditional

23   certification for the dealers for the overtime claims.

24   And at most, the dealer minimum wage claim, to the extent

25   there's a conditional certification and notice, it should

1   refer to that one week of training.  Again, the rest of

2   the claims will be dismissed with prejudice.

3          With respect to the dealers, if you would prefer

4   that I move to that now, just briefly, our point on the

5   dealers gets back to this independent dealer agreement.

6          There's this case I'm sure Your Honor has seen

7   come up once or twice before from this court, Mike v.

8   Safeco, and it talks about a situation at the conditional

9   certification stage where the plaintiff is alleging some

10  aspect of their job duties did not track with what the

11  employment agreement or the job description said, and the

12  court in that case I think very sensibly said, well, for

13  conditional certification there has to be a showing of

14  common evidence, affecting everybody.

15         What's common with respect to the dealers is the

16  independent dealer agreement which specifically says they

17  are not subject to control or direction from anybody.

18  What we have is allegationses in the dealer affidavit

19  contrary to what the written independent dealer agreement

20  says or they are saying they did get control.

21         I think it's exactly on point with Mike v.

22  Safeco and the other cases that we cited that that's just

23  not a circumstance where conditional certification is

24  appropriate, where the plaintiffs are going to have to

25  necessarily rely on their own statements about things that

1    happened contrary to what their written agreement says.

2              THE COURT:  Except, again, we don't have -- from

3    what I've seen, it's not clear that everybody, that is,

4    all the dealers, had this agreement.

5              MR. LAMPE:  Well, the plaintiffs allege they all

6    had the same agreement and in the plaintiff's papers, they

7    specifically say that the agreements we attach are the

8    correct and accurate version of the agreements that the

9    dealers are subject to.  And here we have named plaintiffs

10   in this case, two of them did sign it, are testifying to

11   conditions and circumstances that are contrary to their

12   agreement and they are claiming that they are similarly

13   situated to the other dealers in part because they all had

14   to sign this independent dealer agreement.  So I think

15   this case does fall within the scope of Mike v. Safeco.

16             MR. BHANDARY-ALEXANDER:  Your Honor, if I may?

17             THE COURT:  Yes.

18             MR. BHANDARY-ALEXANDER:  Independent dealer

19   agreements are not a job description.  A description of

20   the job is found in the sworn testimony, which are not

21   allegations.  It's sworn testimony of all the plaintiffs

22   in this case explaining to you why they are similarly

23   situated.

24             So -- and the way we use the independent dealer

25   agreement, the reason we think it's important, is because

1    it's part of the common scheme.  It's the common scheme of

2    how these people are classified.  It's evidence that they

3    are classified as independent contractors.  That's the

4    only reason that we talk about it in the complaint.

5    That's what we think it's evidence of.

6         As to the appointment setters, it simply

7    isn't -- I'm not familiar with any cases in which the

8    merits of the representatives' claims are actually

9    discussed on conditional certification.  The things that

10   are discussed on conditional certification is whether they

11   were subject to a common scheme or policy which we've

12   alleged in spades for the appointment setters, that they

13   were similarly situated and that there was some

14   relationship between that common scheme or plan and

15   unlawful activity.

16        And the unlawful activity is failure to pay

17   minimum wage, which you have sworn testimony in front of

18   you took place, and a failure to pay overtime, which you

19   have sworn testimony in front of you took place.  We think

20   that's more than sufficient.

21        MR. LAMPE:  Well, what else is said, a

22   Connecticut counterpart says it's not a matter of it being

23   unlawful not to pay for certain activity.  Again, as Your

24   Honor correctly pointed out, it's total pay divided by

25   total hours and it shall not drop below a certain amount.

1    That's what's unlawful.  That's what's proscribed.  And

2    there isn't sufficient evidence in this case as to the

3    setters for minimum wage or overtime that there was any

4    sort of a common problem associated with this.

5         The plaintiff could very well prove at trial --

6    and we disagree with this -- the plaintiff could prove at

7    trial that the company didn't pay for the training hour

8    and it had an obligation to by way of some contract, let's

9    say, that would not establish a wage and hour violation at

10   all.  The wage and hour violation is the math.  Total

11   compensation is -- they haven't alleged that.

12        THE COURT:  Why isn't that situation taken into

13   account in the ability to decertify?  In other words, it

14   seems to me they have evidence of one plaintiff with

15   overtime, with some evidence of an overtime violation.

16   They have one plaintiff with some evidence of a minimum

17   wage violation.  If the notice goes out and it turns out,

18   you know, there was nobody else, then you can decertify

19   those claims, can't you?

20        MR. LAMPE:  I think that's almost just too easy

21   an answer -- I mean based on that sort of rationale,

22   notice would always be granted.  If one out of four named

23   plaintiffs, when they submitting affidavits, and this not

24   a matter of there only being one plaintiff, one named

25   plaintiff.  There's four named plaintiffs for overtime,

1    there's four for minimum wage, and they did not and cannot

2    establish violations.  We called them on it in our

3    opposition papers and they did a reply in which they

4    submitted additional affidavits, only one in four was able

5    to do it.

6          So I think it's fair to assume from that that

7    even though it's a light burden, the plaintiffs cannot

8    establish uniform policy.  They don't have to prove that

9    there's, that there's a uniform policy that was unlawful

10   at this stage, I would certainly agree with that, but they

11   have to prove there's some uniform circumstance that

12   covers the punitive class through which a jury can look at

13   this evidence and decide, okay, is this lawful or is this

14   not unlawful?  At this stage the predicate is there has to

15   be some sort of uniformity that binds all the punitive

16   classes together when we have named plaintiffs who are

17   unable to establish that they suffered a problem.

18   Seventy-five percent, that's an indication that the low

19   bar is not satisfied here.

20          THE COURT:  Well, I think it's a very low bar

21   and at least conditional certifying is a very low bar and

22   it seems to me that, you know, the question really is

23   whether there are similarly situated opt-in plaintiffs.

24   What is similar here is the allegations that certain time

25   worked was not paid.  And the question is whether there

1    are plaintiffs, other opt-in plaintiffs who weren't, as

2    apparently no one was, weren't paid for these particular

3    types of tasks and then whether their math works out to

4    raise a situation where either they worked more than the

5    required number of hours or they were paid less than the

6    minimum wage when you do the math.  It seems to me that's

7    something to decide at the next stage, not at this one,

8    and I don't think I can say that now that we have in the

9    reply affidavit the one plaintiff who seemingly satisfies

10   the minimum wage claim, I think we let it go and we see

11   what happens after the notice goes out.

12           MR. LAMPE:  I would say, even under that logic,

13   the conditional certification should be denied for the

14   setters for the overtime claim because they are not even

15   alleging, with one exception, that they even worked over

16   40 hours so it's not a matter of their not being paid for

17   certain hours and whether the math would drop them below a

18   certain level.  If you're not working over 40 hours,

19   you're simply not in the ballgame in terms of seeking

20   overtime pay and only one of the four named plaintiffs

21   ever claimed they worked over 40 hours in a given week.

22   The others did not.

23           THE COURT:  Right.

24           MR. LAMPE:  So for the plaintiff to establish

25   the uniform circumstance that led to a violation, you

1    know, to your point about the minimum wage, your point was

2    that the nonpayment of certain activities is a common

3    circumstance that couldn't lead to violations.  We think

4    that's not sufficient but I respect the court's review on

5    that.

6           With respect to the overtime claim they are not

7    even alleging that they experienced the common condition

8    in any sort of uniform way.  So I think certification

9    should be denied at least for overtime on the setters on

10   that basis.

11          THE COURT:  Well, isn't the common situation

12   very similar, that is, the failure to pay for certain

13   types of activities meant that those hours weren't

14   included in the hours paid, and if you -- I think the

15   suggestion is if you include those hours on a regular

16   basis, there will be he situations -- perhaps not every

17   week or not every plant, of situations where people worked

18   more than 40 hours a week and were not paid the required

19   overtime if you reclassify certain time as being time that

20   should be paid.

21          So I think there is a commonality there.  I

22   think the question really is whether there's anybody else

23   out there, and given the minimal burden and the minimal

24   evidence that has been presented, it seems to me that's

25   enough to get by at this stage.  You may well have a

1    strong decertification argument or summary judgment

2    argument or whatever, but I think probably the notice goes

3    out and we get a little discovery on that.

4              All right.  Other thoughts?

5              MR. BHANDARY-ALEXANDER:  One thing pertaining to

6    the notice that I didn't bring up until we heard what your

7    decision was, was that we have agreed to a 90 day opt-in

8    period and that's based on the community of people --

9              THE COURT:  That's fine.

10             MR. BHANDARY-ALEXANDER:  -- that work in this

11   place.  We have to, we have to fix the notice in a couple

12   ways, we already talked about that.  One most obvious way

13   is that the dealers will not have the overtime claim

14   referenced in the notice.  There's a few other little

15   things.

16             THE COURT:  They want to get their defense, some

17   statement of their position.

18             MR. LAMPE:  They want a statement which we don't

19   object to as long as it's reasonable.  And I think we did

20   have some disagreement in the papers about how long it

21   would take us to agree on the form of the notice and the

22   content of the notice.

23             THE COURT:  I'll be frank.  I think this should

24   be done very promptly.  This case has been pending a long

25   time and with the passage of time, the claim is diminished

1    everyday, and I feel badly frankly that in light of the

2    fact that it's gotten bounced between judges and so forth,

3    that it's taken as long as it has.  I really don't want to

4    see much if any more time.  I was thinking a week or less

5    frankly to get a notice put together.

6          MR. LAMPE:  A week is fine for us.

7          MR. BHANDARY-ALEXANDER:  A week is fine.  And

8    there's just one other issue which is the provision of

9    a -- I'm calling it the class list, it's actually a

10   collective list, I guess.  As far as we know, the names

11   and addresses of the employees is with S. Z. Enterprises

12   principally and not with the Kirby Company, and we've

13   asked for that information in discovery and received a

14   partial response and we expect to get a full response, and

15   Attorney Aronson has worked with us on that.  But there

16   could be a little bit of negotiation we need to do about

17   figuring out whether the clock, whether the list is

18   actually complete, and hopefully we can just work that out

19   ourselves and not come to you, but I wanted to flag it.

20         THE COURT:  On that, let me comment, I know

21   there's a dispute in the papers about what period is at

22   issue.  It seems to me the notice could fairly go to a

23   broader group than the group that may have timely claims,

24   and I don't see any real prejudice in doing that.  It may

25   mean a little more work for all of us in terms of sorting

```
1    out people who may have statute of limitations problems at
2    the other end but I think we're going to have to do that
3    anyway.  So my thought is to require that the notice go to
4    all folks who had a dealer relationship or a setter
5    relationship with the defendants within three years of the
6    date of the filing of the complaint.
7              MR. BHANDARY-ALEXANDER:  And one, this may just
8    be a technicality but we do think that technically you
9    have to order the production of that list.
10             THE COURT:  That's when I'm saying.
11             MR. BHANDARY-ALEXANDER:  Okay.
12             THE COURT:  That's in effect what I'm trying to
13   do.  I'm trying to say it perhaps more obliquely than I
14   need to but that's what I thought I was doing.
15             MR. BHANDARY-ALEXANDER:  Okay, thank you.
16             MR. LAMPE:  The list is -- counsel for
17   co-defendants will provide the list, I'm sure.
18             MR. ARONSON:  Your Honor, we will comply with
19   whatever requirements we have to produce the list of
20   whoever we can identify.  We have those records.
21             THE COURT:  Do the best you can do.
22             MR. ARONSON:  Thank you.
23             MR. LAMPE:  I would just ask for one
24   clarification.  The conditional certification motion to my
25   understanding is being denied with respect to the dealer
```

```
 1    overtime claim and the dealer minimum wage claim under the
 2    first week.
 3              THE COURT:  Correct, as moot.
 4              MR. LAMPE:  Because of the dismissal with
 5    prejudice.
 6              THE COURT:  Yes, I didn't mean to imply
 7    otherwise.
 8              MR. LAMPE:  Thank you, Your Honor.
 9              THE COURT:  Yes.  Obviously we're only
10    certifying claims that are still in the case.
11              MR. LAMPE:  Thank you, Your Honor.
12              MR. BHANDARY-ALEXANDER:  Thank you.
13              THE COURT:  Are there other details of that
14    certification notice that need to be resolved now?
15              MR. ARONSON:  I'm not sure, Your Honor, because
16    we haven't had a chance to talk through all these
17    different issues, but I know in other cases we've had with
18    Your Honor, if we do have disputes that develop, would you
19    like us to call the court?
20              THE COURT:  Please, absolutely, call me up.
21    Especially -- I have a fair amount of time this week and
22    things are still fresh so it would be helpful to get that
23    done sooner rather than later.
24              MR. ARONSON:  Thank you, Your Honor.
25              THE COURT:  Okay.  So in short, except for the
```

```
1    claims that have been withdrawn, the motion to proceed as

2    a collective action is granted subject to the rulings that

3    have been made on the record here today.  Okay?

4            I don't intend to write on this either, so if

5    anybody wants me to clarify or further articulate that

6    ruling or the basis for it, please let me know now.

7            MR. BHANDARY-ALEXANDER:  No, thank you.

8            MR. LAMPE:  No.

9            THE COURT:  Okay.  Well, quickly because I know

10   it's late.  What else can we meaningfully do today?  I

11   assume that -- the parties sound like you've started

12   discovery.

13           MR. BHANDARY-ALEXANDER:  Yes, sir.

14           THE COURT:  All right.  Do we have meaningful

15   deadlines in the case at present?

16           MR. LAMPE:  We do.  We had conference with you,

17   Your Honor, a couple weeks back, if you recall, you set a

18   deadline for the end of discovery and first phase motions,

19   and that takes us through the stage of the case that we

20   asked you to schedule us through, so I think we're set on

21   scheduling.

22           THE COURT:  Okay.  All right.  Well, I

23   appreciate you coming in and I'm sure we'll be seeing more

24   of you.

25           MR. BHANDARY-ALEXANDER:  Thank you, Your Honor
```

1          THE COURT:  We'll stand adjourned.

2          (Whereupon the above matter was adjourned at 5:20

3    o'clock, p. m.)

C E R T I F I C A T E


        I, Susan E. Catucci, RMR, Official Court

Reporter for the United States District Court for the

District of Connecticut, do hereby certify that the

foregoing pages are a true and accurate transcription of

my shorthand notes taken in the aforementioned matter to

the best of my skill and ability.



        /S/ Susan E. Catucci
        _____

            Susan E. Catucci, RMR
            Official Court Reporter
            915 Lafayette Boulevard
        Bridgeport, Connecticut  06604
            Tel: (917) 703-0761